J-A19021-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| TOP OF THE HILL PLAZA PARTNERS, LP | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | No. 3034 EDA 2018 |
| HAYDEN HOLDINGS, LTD., SPA ELYSIUM, LTD., PARK 55, LLC, WENDY FELDMAN AND FRANCIS HAYDEN | : | |

Appeal from the Judgment Dated, August 30, 2018,
in the Court of Common Pleas of Philadelphia County,
Civil Division at No(s):  May Term, 2014, No. 00147.

| | | |
|---|---|---|
| TOP OF THE HILL PLAZA PARTNERS, LP | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| HAYDEN HOLDINGS, LTD., ET AL., | : | |
| | : | No. 3073 EDA 2018 |
| Appellant. | : | |

Appeal from the Judgment Entered, August 30, 2018,
in the Court of Common Pleas of Philadelphia County,
Civil Division at No(s):  No. 140500147.

BEFORE:   PANELLA, P.J., KUNSELMAN, J., and STEVENS*, P.J.E.

MEMORANDUM BY KUNSELMAN, J.:                **FILED APRIL 28, 2020**

---

*   Former Justice specially assigned to the Superior Court.

This lawsuit began when neighboring property owners could no longer agree to operate a joint commercial shopping center and parking lot in the Chesnut Hill area of Philadelphia. The shopping center consists of three lots. Currently, Top of the Hill Plaza Partners, LLC (TOH) owns two of them, "Lots A and B". Hayden Holdings, LTD's (Hayden) owns the third, "Lot C". The trial court entered judgment declaring that TOH had an easement to use Lot for ingress/egress and parking, and enjoining Hayden from blocking TOH's use and access to that lot. Both parties appealed this decision and other equitable relief the trial court granted. TOH also appeals the amount of damages the trial court awarded to Hayden for use of this lot. After careful review, we affirm in part and reverse in part.

Ownership history of these properties, dating back to the 1950s, together with various agreements of the parties and their predecessors is important to understand and resolve the issues in this.

The original 1950 deed conveyed Lot C to a predecessor of Hayden and contained the following language:

> TOGETHER with the right, liberty and privilege of using passageways to the Northeast and Southwest and a parking area in the rear of the premises hereinbefore described as follows: [Metes and Bounds description] as and for a PARKING AREA, PASSAGEWAYS and DRIVEWAYS for the mutual use and accommodation of the owners, tenants and occupiers of the premises hereinbefore described **and/or others to whom the use thereof may be granted by the said Grantors for ingress, egress and regress to and from Bethlehem Pike to said parking area**; PROVIDED, however that said passageways or driveways shall be kept free and clear of all parked vehicles, and/or any other obstruction, which might prevent free access to

> the Parking Area from Bethlehem Pike; SUBJECT, however, to the proportionate part of the expense of the maintenance and upkeep of said passages and parking area at all times, hereafter, forever.

Plaintiff's Ex. 2-A. (emphasis added).

At the time of the original 1950 deed, all of the lots were used as commercial property. However, from 1950 to 1973, Lots A and B had separate parking and ingress/egress from Lot C.

In 1973, the owner of Lot C, (a trust with Bert Levy acting as trustee "Bert Levy, Trustee"), began a plan to develop all three lots into a unified shopping center. The trustee eventually brought in Top of the Hill Associates (TOH Associates) to develop the properties. TOH Associates entered into a "Lease" with the trust, which granted it the managing rights over Lot C to develop a single commercial complex using all three lots. Although TOH Associates' management and development rights regarding Lot C were secured by the Lease, the Lease had certain conditions to be satisfied before it became effective. The Lease did not convey an easement over Lot C, as potentially contemplated by the original 1950 deed.

To achieve the joint operation of the three lots as one commercial complex, the lot owners and developer worked together to obtain the necessary variances from the local zoning hearing board. Although they initially filed separate applications, they eventually consolidated the applications and submitted a joint plan that showed the three lots merged into one shared lot. The building plans also showed one entrance and exit originating at Bethlehem Pike. This driveway connected to designated parking

areas on both Lots A and C (shared parking lot); there was no parking on Lot B.  The separate, existing access to Lots A and B was eliminated.

After the new commercial complex was built on Lots A and B, the shared lot was used by all of the lots' owners, tenants, employees, customers, and guests.  Two one-way lanes were used for vehicular traffic to enter and exit the shared parking lot from the single point on Bethlehem Pike.  At some point, the parking lot manager placed a toll booth between the two lanes to charge for parking on the shared lot.

Since 1974, all drivers visiting the shopping center entered the shared parking lot via a single lane, which was entirely on Lot C; drivers exited the shared parking lot using a single lane that straddled Lots A and C.  However, the evidence clearly indicated that drivers used that single entrance and exit point, without incident and with knowledge of all property owners, since the 1970's.

The following diagram presented at trial shows these lots as they existed in 1974 after construction of the new complex.  **See** Exhibit 41.  Lot B is the far left lot; Lot A is the center lot; and Lot C is the far right lot.  The single entrance and exit points are depicted with arrows on the bottom of the diagram.



TOH acquired Lots A and B on July 31, 2007. Following difficulties with its role as manager under the Lease, TOH elected to terminate the Lease on December 2, 2010, and consented to having the owner of Lot C, then the Bert O. Levy Living Trust (Living Trust), manage the shared parking lot.

A few weeks later, Hayden acquired Lot C from the Living Trust on December 17, 2010. For several years, both parties continued to use the single point of entrance and exit from Bethlehem Pike and the shared parking lot in the same manner as all their predecessors since the shopping center was built in the 1970's without any agreement.

Sometime in 2014, however, Hayden unilaterally attempted to separate the shared parking lot into two distinct areas and blocked TOH's access from Bethlehem Pike via Lot C.  This configuration made ingress/egress unsafe for drivers and pedestrians.  Visitors to Lots A and B were forced into tighter lanes.  Also, parking spaces situated on the property line were roped-off and no longer accessible.  Visitors to Lots A and B did not have use of the Lot C parking spots.  Additionally, Hayden moved the toll booth onto its property, Lot C.

The following diagram illustrates the changes from the prior configuration.



After Hayden changed the shared lot configuration, TOH filed this lawsuit. Following a bench trial, the court concluded that TOH had an express easement to use the driveway on Bethlehem Pike and parking area on Lot C for the benefit of Lots A and B. As a result, it issued a permanent injunction enjoining Hayden from interfering with TOH's rights to use the driveway and parking area on Lot C and permanently ordered Hayden to return the property

to the configuration that existed in April 2014 as showed on the first diagram above.

The trial court also directed the parties to hire a third party to implement the permanent injunction and manage the operation of the parking areas on Lots A and C, with costs to be shared equally by Hayden and TOH. Judgment Order, 8/29/18, at 1-3. Additionally, the trial court required TOH and Hayden to share equally in the future expenses for upkeep and maintenance of the driveway and parking area on Lot C and the toll booth. However, the trial court found TOH solely responsible for all expenses associated with Lot A. Trial Court Findings of Fact/Conclusions of Law, 6/30/17, at 21; but see Judgment Order, 8/29/18, at 1-3, and discussion infra (the shared parking area on Lot A).

Finally, the trial court granted TOH's request for an accounting of the expenses incurred since January 2014 for maintenance of the driveway and parking area on Lot C to determine TOH's proportionate share as required under the easement. Following a separate hearing, the trial court determined that TOH owed Hayden $81,895.45, to be paid from funds TOH escrowed pending resolution of this issue. *Id.* at 2.

The parties timely filed cross-appeals.

TOH raises four issues for our review:

1. Whether the trial court erred in rejecting TOH's claim for an easement by estoppel and/or irrevocable license over Lot C?

2. Whether the trial court erred in unilaterally allowing Hayden's owners, tenant[s], employees, customer[s] and guests use of the driveway and parking area on Lot A without compensation?

3. Whether the trial court erred in awarding Hayden [] an amount for the expense of operating a commercial parking operation?

4. Whether the trial court erred in awarding Hayden [] an amount for expenses during the period that TOH was excluded from the use of Lot C?

TOH's Brief at 7.

Hayden raises two issues for our review:

1. Whether the trial court erred in finding TOH has an easement by grant over the Lot C parking areas, passageways and driveways?

2. Whether the trial court erred in granting injunctive relief against Hayden Holdings?

Hayden's Brief at 5.

In their first issue, both parties challenge TOH's claim to a property right for the use of Lot C. TOH claims the trial court should have found that it had an irrevocable license. Hayden claims that the trial court erred in finding that TOH had an express easement.

The following principles guide our review of both TOH and Hayden's first issue.

> Our standard of review in a declaratory judgment action is narrow. We review the decision of the trial court as we would a decree in equity and set aside factual conclusions only where they are not supported by adequate evidence. We give plenary review, however, to the trial court's legal conclusions.
>
> In reviewing a declaratory judgment action, we are limited to determining whether the trial court clearly abused its discretion or committed an error of law. Judicial discretion requires action in

conformity with law on facts and circumstances before the trial court after hearing and consideration. Consequently, the court abuses its discretion if, in resolving the issue for decision, it misapplies the law or exercises its discretion in a manner lacking reason.

***Jarl Investments, L.P. v. Fleck***, 937 A.2d 1113, 1121 (Pa. Super. 2007) (internal citations and quotations omitted).

In its first issue, TOH argues that the trial court erred in concluding that it had an easement by express grant rather than an irrevocable license. Specifically, TOH argues that it presented clear and convincing evidence that TOH's predecessor detrimentally relied upon the promise that it could use Lot C for ingress/egress and parking to develop and construct the commercial complex on Lots A and B at substantial cost. TOH's Brief at 39-40.

Conversely, in Hayden's first issue, Hayden argues that the trial court erred in finding that TOH had an express easement by grant, and similarly challenges any finding of an irrevocable license. According to Hayden, TOH did not have an easement or any other property right for ingress/egress or parking on Lot C. Instead, TOH's use of Lot C was secured by the long term Lease executed in 1974. When TOH terminated this Lease and entered into a settlement agreement relating to its outstanding obligations under the Lease, Hayden argues TOH relinquished it rights to use the driveway and parking on Lot C. Hayden's Brief at 34, 47, 55.

In concluding that TOH had an easement by express grant, the trial court relied upon the language contained in the 1950 deed, and similar language contained in subsequent deeds, notably, the 1973 deed.

- 10 -

Specifically, the trial court found that the right to use Lot C was given to "others." The court concluded this meant any person or entity that had not already been granted use of the parking, passageways, and driveways, *i.e.*, an owner, tenant, or occupant of Lot C. Trial Court Opinion, 7/3/18, at 9. The trial court opined that this language included an adjacent landowner, namely, owners of Lots A and B, as they were not an "owner, tenant, or occupant" of Lot C.

In reaching this decision, the trial court relied upon the February 12, 1974 letter submitted to the Zoning Hearing Board on behalf of Bert Levy, Trustee and TOH Associates. In that letter, their counsel assured the zoning board that the "combined sites have adequate space for at least sixty-five parking spaces, together with all needed access to the parking spaces and buildings." The trial court opined that this reflected Bert Levy, Trustee's decision to grant public use of Lot C for the development of a commercial complex on all three lots as proposed in the zoning applications. Trial Court Opinion, 7/3/18, at 10 n. 46.

The trial court also concluded that TOH did not have an irrevocable license. Initially, the trial court reasoned that, because no one spent money to alter Lot C during the construction project to prevent it from being returned to the way it was in 1974, no irrevocable license was created. Findings of Fact/Conclusions of Law, 6/30/17, at 18. However, in its opinion following TOH's post-trial motion on this issue, *inter alia*, the trial court modified its rationale and explained that TOH did not acquire an irrevocable license,

because such a license was not assignable. The court further reasoned that Lot A's previous owners made changes to the property and expended money in pursuit of the shopping complex development itself and not on the promise to use Lot C. Trial Court Opinion, 7/3/18, at 12.

Upon a thorough review, we are constrained to disagree with the trial court's conclusions that TOH obtained an easement by express grant and did not acquire an irrevocable license. As we explain below, the deeds did not convey an easement. Instead, TOH, as owner of Lots A and B, has an irrevocable license for the use of Lot C to enter and exit the properties from Bethlehem Pike and for parking. Hayden, as owner of Lot C, likewise has a right to use Lot A for parking and egress. Our rationale follows.

An easement is an interest in land that is in the possession of another. Restatement (First) of Property § 450 (1944). Notably, "[t]he law is jealous of a claim to an easement, and the burden is on the party asserting such a claim to prove it clearly." ***Mann-Hoff v. Boyer***, 604 A.2d 703, 706 (Pa. Super. 1992) (quoting ***Becker v. Rittenhouse***, 147 A. 51 (Pa. 1929)). An easement may be created by ***express agreement in compliance with the statute of frauds***, or by implication, necessity, or prescription.[1] ***Morning Call, Inc. v. Bell Atl.-Pennsylvania, Inc.***, 761 A.2d 139, 142 (Pa. Super. 2000) (emphasis added). In particular, easements by express grant are to be

---

[1] Although TOH also claimed to have obtained an easement by implication or necessity, only the trial court's decision regarding an easement by express grant is before us on appeal.

construed in accordance with the intentions of the parties, as determined from examining the agreement as a whole. *Owens v. Holzheid*, 484 A.2d 107, 109 (Pa. Super. 1984). "[T]he same rules of construction apply to deeds granting easements as to contracts generally." *Bito Bucks in Potter, Inc. v. Nat. Fuel Gas Supply Corp.,* 449 A.2d 652, 653 (Pa. Super. 1982). Our Supreme Court stated that:

> In construing a deed or a contract, certain general principles must be kept in mind. First, it is the intention of the parties *at the time of entering in thereto that governs,* and such intention is to be gathered from a reading of the entire contract. In addition, "Contracts must receive a reasonable interpretation, according to the intention of the parties *at the time of executing them*, if that intention can be ascertained from their language.... "

*Wilkes-Barre Twp. Sch. Dist. v. Corgan,* 170 A.2d 97, 98 (Pa. 1961) (citations omitted) (other emphasis added). Based upon our review of the original 1950 deed conveying Lot C (from Leona and Syl Levy (the Levys) to Charles Henry) and considering the parties' intentions at that time, we conclude that Hayden's predecessor did not create an easement by express grant to the owners of Lots A and B or to any other individual or entity.

The original 1950 deed conveyed Lot C to Charles Henry, along with the right of the owner, tenants, and occupiers to use the "parking area, passageways, and driveways." Additionally, the Levy's reserved to themselves the ability to grant or convey to "others" the right to use the "parking area, passageways, and driveways . . . for ingress/egress and regress to and from Bethlehem Pike to the parking area" on Lot C. "Others" is

undefined in the deed. And, while we agree with the trial court that the language was intended to allow someone or some entity other than the "owner, tenant, or occupier" to use Lot C, the Levys did not specifically give that right to anyone or any entity at that time. The deed made no reference to the owners of adjacent lots A and B, any other individual, entity, or the general public of Chestnut Hill.

Instead, the 1950 deed referred to rights in "others to whom the use thereof *may* be granted". From this language, it is evident that the Levys merely contemplated that while Henry owned Lot C, the Levys could, if they chose, allow "others" to use the parking area, passageways and driveways on Lot C. Conceivably, that could have included the owners of Lots A and B or some other individual or entity in the future. However, the Levys did not convey any interest at that time.[2]

We reach the same conclusion with respect to the 1973 deed, which was executed shortly before the start of the development on the three lots. This deed conveyed Lot C from the Levy Executors to the Levy Trustees, and referenced the original 1950 deed and language allowing the grantor (now the Levy Executors) to give "others" the right to use Lot C's "parking area, passageways, and driveways." However, it too did not give this right specifically to anyone or any entity, in particular the owners of Lots A and B, TOH Associates, or any other individual or entity, as "others" remained

---

[2] We note that shortly after the Levys conveyed Lot C to Charles Henry, the property was conveyed back to the Levys.

undefined. Instead, it also merely reserved to the grantor the ability to give "others" the right to use Lot C, as described, in the future, if they chose. Therefore, as of early 1973, no express easement was granted.

We note, however, that these early deeds evince the Levys' and their successors' recognition of the importance of Lot C, their desire to make beneficial use of it, and their desire, potentially, to grant its use to others. Consequently, we consider whether, at some other point in time, Hayden's predecessor impliedly granted some right to use Lot C's "parking area, passageways, and driveways," by easement or otherwise, to TOH's predecessor as TOH claims. If so, we must consider the nature and extent of that right. In particular, we consider, as the trial court did, what transpired when the parties' predecessors sought to develop an integrated commercial complex on all three lots.

Significantly, in 1973, Bert Levy, Trustee, the then owner of Lot C, decided to develop Lots A, B, and C into a contiguous commercial and residential complex.[3] It initially hired an affiliated entity, LETR, was hired initially to be the developer on the project. Levy and LETR applied to the zoning board for approval of the project initially in October 1973. The planning of this project, in conjunction with the Chestnut Hill Community Association, had been ongoing for many months. The goal was to revitalize Lots A and B

---

[3] The residential component of this project was later dropped.

which had become run down and make good use of all three properties for the benefit of the Chestnut Hill Community.

Sometime thereafter, early in 1974, TOH's predecessor, TOH Associates took over as the developer and filed a separate application for approval of the project. Ultimately, two zoning applications of the property owners/developer were consolidated and a joint building plan was submitted showing the three lots as one shared lot. The plan specifically contemplated parking and exclusive access on Lot C in connection with the new development on Lots A and B.

On February 22, 1974, the zoning hearing board approved the development conditioned on compliance with the assurances contained in the February 12, 1974 letter from counsel. Specifically, the permit to develop the complex on Lots A and B was contingent upon there being at least 75 parking spaces (mostly located on Lot C) for use by the combined sites and access to the parking spaces and buildings. The plans, as submitted to and approved by the board, showed a single point of ingress/egress from Bethlehem Pike which connected to the parking areas on Lots A and C. The other then-existing access to Lots A and B was eliminated.

Based upon these facts, the trial court concluded that, through the zoning process, Bert Levy, Trustee agreed to allow ingress/egress and parking on Lot C for use by Lots A and B, which was consistent with his vision to develop the three lots into a large, commercial complex and enhance the Chestnut Hill Community. *See* Trial Court Opinion, 7/3/18, at 4. This promise

- 16 -

was evident as early as October 1973 when Bert Levy, Trustee applied for a zoning permit.

However, contrary to the trial court's opinion, we conclude as a matter of law that, Bert Levy, Trustee's promise did not establish an express easement because the statute of frauds requires an easement to be in writing. At that time, there was no writing conveying an interest in Lot C to TOH Associates or anyone else or any other entity.

For the reasons set forth below, we reject Hayden's contention that the Lease was the source of TOH's right to use Lot C. Instead, we conclude that, at the time of the zoning proceedings, Bert Levy, Trustee impliedly granted a license to use Lot C for parking and ingress/egress from Bethlehem Pike in connection with the commercial complex to be developed on Lots A and B.

> With respect to licenses, generally, this Court has stated:

> Licenses are often compared to easements. In general, a license is a mere personal or revocable privilege to perform an act or series of acts on the land of another, which conveys no interest or estate. A license is distinguishable from an easement because it **is usually created orally**, is revocable at the will of the licensor, and is automatically revoked by the sale of the burdened property.

***Morning Call, Inc. v. Bell Atl.-Pennsylvania, Inc.***, 761 A.2d 139, 144 (Pa. Super. 2000) (citations omitted). However, though generally revocable, a license may become irrevocable under the rules of estoppel. In those circumstances, as we have explained, it is similar to an easement.

> The Pennsylvania Supreme Court adopted the equitable doctrine of irrevocable license in the mid-nineteenth century stating that a license to do something on the licensor's land when followed by

the expenditure of money on the faith of it, is irrevocable, and is to be treated as a binding contract. The Court subsequently explained that such a license, while not strictly an easement, is in the nature of one. It is really a permission or license, express or implied, to use the property of another in a particular manner, or for a particular purpose. Where this permission has led the party to whom it has been given, to treat his own property in a way in which he would not otherwise have treated it ... it cannot be recalled to his detriment. Thus, the irrevocable license gives absolute rights, and protects the licensee in the enjoyment of those rights. Moreover, successors-in-title take subject to an irrevocable license if they had notice of the license before the purchase.

***Morning Call, Inc. v. Bell Atl.–Pennsylvania, Inc.***, 761 A.2d 139, 144 (Pa. Super. 2000) (citations, footnotes, and quotation marks omitted).

In concluding that TOH did not have an irrevocable license, the trial court focused on what transpired in 2007 when TOH acquired the property from TOH Associates. We agree with the trial court that no irrevocable license was created at that time; no promises were made to TOH, and TOH did not make changes to or spend significant money on Lots A and B. However, based upon our review of the record, we conclude that the license Bert Levy, Trustee granted in 1973 became irrevocable when TOH's predecessor proceeded to develop all three lots as an integrated commercial complex as represented to the zoning board.

Following approval from the zoning hearing board in 1974, TOH Associates acquired Lots A and B for the project. TOH then proceeded to construct a new commercial complex on Lots A and B in accordance with the plans presented to the zoning board. The improvements required the use of Lot C for parking as well as ingress/egress from Bethlehem Pike. By design

and permission of the zoning board, there was no access to this complex from Germantown Avenue; the Top of the Hill Shopping Center was designed and built in a way that cut off access to Lots A and B from Germantown Avenue. Findings of Fact/Conclusions of Law, 6/30/17, at 17. Instead, the only access to the complex was from Bethlehem Pike through Lot C. Without the access on Lot C for ingress/egress to Lot A, there was insufficient space for a safe and zoning compliant two lane driveway on Lot A. Similar issues existed on Lot C. The new layout of the properties further limited the availability of parking on Lots A and B themselves.

From these circumstances, one can infer that TOH Associates relied on Bert Levy, Trustee's promise that Lot C could be used in connection with the development of Lots A and B as jointly represented to the zoning board. Furthermore, although no evidence was presented at trial to show how much was spent on this project, this development obviously was a significant undertaking, not just for the parties' predecessors, but also the community of Chestnut Hill. It is further apparent, that returning Lots A and B to their prior condition, likewise, would be a substantial undertaking and a detriment to the Chestnut Hill Community.

Finally, contrary to the trial court's conclusion, an irrevocable license may be transferred if the subsequent purchaser has notice of the license before the purchase. *See Morning Call*, *supra*. From our review, we conclude that there was sufficient constructive notice for the owners of Lots A and B to have purchased those properties subject to an irrevocable license

over Lot C. Wendy Feldman, the president of Hayden testified that, when Hayden purchased Lot C, she did not know that Lot C was subject to any license. She knew that TOH's Lease for Lot C was terminated because she had been a tenant on Lot C for 11 years prior to Hayden purchasing it. However, Feldman had been in the Chestnut Hill Community for over 30 years. During that time period, the properties were used in connection with one another. As such, she had constructive notice of the license when Hayden purchased Lot C.

Additionally, although TOH did not know the legal basis for its use of Lot C, it was evident that, when TOH took over Lots A and B from TOH Associates, the properties were being used in conjunction with one another as one integrated lot. Thus, TOH also had constructive notice of the license.

Based on these facts, we conclude that the owner of Lots A and B, TOH, has an irrevocable license to use the parking area and ingress/egress from Bethlehem Pike to access the parking areas on both Lots A and C as represented to and approved by the zoning board in 1974 and as it has existed for more than 40 years.[4]

We reach this conclusion despite Hayden's argument that only the Lease controlled TOH's right to use Lot C. As the trial court found, the Lease did not

_____

[4] We note that our conclusion is limited to the particular circumstances of this case. Whether an irrevocable license exists must be examined on a case-by-case basis as this determination is equitable in nature. Contrary to Hayden's contention, where a developer secures temporary rights in neighboring property, those rights will not necessarily become permanent in all cases as Hayden suggests. *See* Hayden's Brief at 37.

take effect until August 6, 1975, once all of the conditions had been fulfilled. Trial Court Opinion, 7/3/18, at 10. As discussed above, by that point, use of Lot C already had been promised for the development of Lots A and B.

Furthermore, the purpose of the Lease was not to grant the use of Lot C for ingress/egress and parking in connection with Lots A and B even though it may have been used to convince the zoning hearing board to approve this project. Generally, a lease entitles a lessee to **more rights** than typically held by a licensee. ***Dailey's Chevrolet, Inc. v. Worster Realties, Inc.***, 458 A.2d 956, 960 (Pa. 1983). Here, the Lease gave greater rights to TOH Associates than those afforded under the license granted in connection with the development of Lots A and B. For example, the Lease gave exclusive possession of all of Lot C to TOH Associates. This interest was far more significant than that granted under the license. Additionally, as the trial court observed, the Lease covered more than just permitting the use of Lot C for the benefit of Lots A and B. Findings of Fact/Conclusions of Law, 6/30/17, at 17. While the Lease granted the Lessee use of the parking area and driveway, it also included use of the building situated thereon and its leased spaces. Significantly, the Lease obligated TOH Associates to manage the property, including the building and to oversee the tenants. Consequently, the Lease enabled TOH Associates, and later TOH, to operate the three lots as an integrated, commercial complex as contemplated by Bert Levy, Trustee. The Lease gave TOH exclusive control over Lot C; without the lease, Bert Levy could have allowed others to use the property, notably the parking area and

driveway. As such, the original license to use part of Lot C did not change, but the Lease granted additional rights and obligations to TOH.

Moreover, contrary to Hayden's argument, because the Lease was not the source of TOH's right to use part of Lot C, the termination thereof did not affect the license previously granted. Instead, the termination of the Lease only ended the additional rights and obligations provided for therein, *i.e.*, TOH's exclusive possession of Lot C. In fact, consistent with this conclusion, after termination of the Lease, TOH continued to use Lot C access and parking as the prior owners of Lots A and B did for 40 years. This continued for almost four year following the termination of the Lease in 2010. Thus, no one intended for this right to end when the Lease terminated.

In sum, we conclude that TOH's predecessor acquired an irrevocable license to use Lot C for ingress/egress and parking in connection with its shopping center. The license was passed to TOH upon its acquisition of the properties. The termination of the Lease did not terminate the license, and consequently, the license continues to give TOH the right to use Lot C as discussed. Although the basis for its decision was incorrect (because it found an easement, not an irrevocable license), the trial court properly granted TOH's request for a permanent injunction.

We now turn to the parties' issues regarding the trial court's award of other equitable relief. In relation to each of TOH and Hayden's second issues, both of which challenge the court's ability to order other equitable relief, we note:

[A]ppellate review of equity matters is limited to a determination of whether the chancellor committed an error of law or abused his discretion. The scope of review of a final decree in equity is limited and will not be disturbed unless it is unsupported by the evidence or demonstrably capricious.

*Vautar v. First Nat. Bank of Pennsylvania*, 133 A.3d 6, 12 (Pa. Super. 2016)(quoting *First Capital Life Insurance Company v. Schneider, Inc.*, 608 A.2d 1082 (Pa. Super. 1992)) (citations omitted).

"Courts sitting in equity hold broad powers to grant relief that will result in an equitable resolution of a dispute." *Williams Twp. Bd. of Supervisors v. Williams Twp Emergency Co., Inc.*, 986 A.2d 914, 921 (Pa. Cmwlth. 2009). "[A] decree which accords with the equities of the cause may be shaped and rendered; the court may grant any appropriate relief that conforms to the case made by the pleadings although it is not exactly the relief which has been asked for by the special prayer." *Lower Frederick Twp. v. Clemmer*, 543 A.2d 502, 512 (Pa. 1988). However, "a trial court must formulate an equitable remedy that is consistent with the relief requested;" thus, "while a chancellor in equity may fashion a remedy that is narrower than the relief requested, he or she may not grant relief that exceeds the relief requested." *Williams Twp., supra*.

In its second issue, Hayden claims that any equitable relief should be limited. Specifically, Hayden argues that the trial court's requirement that the parties hire a third-party manager to implement the permanent injunction and manage the parking areas on Lots A and C was improper. Hayden contends

that neither party requested such relief; and it should be allowed to manage its own property. Hayden's Brief at 82-83.

Significant to the trial court's appointment of a third-party manager here was that, in 1974, Lots A, B and C were designed and developed to be an integrated complex. To ensure that TOH could continue to use Lot C as so intended, the trial court prohibited Hayden from blocking TOH's use thereof. The trial court believed that this could not be done without assistance from a third-party manager.

The parties' inability to resolve the issues confronting them and cooperate for the good of the community, as their predecessors had done, necessitated the use of a third-party manager. Moreover, a third party had managed the parking area for years without incident. In fact, the problems arose between the parties once the third-party manager ended its services.

As noted above, a court sitting in equity has broad authority to fashion an appropriate remedy. Although neither party requested this specific form of relief, in its prayer for relief, TOH asked for "all other relief as the court may deem just." The relief granted is consistent with maintaining TOH's right to use Lot C, and ensuring the continued operation of the parking areas as a shared lot. We, therefore, conclude that the trial court did not commit an error of law or abuse its discretion in granting this relief.[5]

---

[5] Certainly, if the parties jointly agree and are able to administer the lots without a third party, they may agree to do away with this position, provided such agreement is approved by all parties and the trial court.

In its second issue, TOH similarly claims that the trial court erred in crafting its equitable remedy to grant Hayden, as the owner of Lot C, a reciprocal license to use Lot A. Specifically, TOH claims that the trial court should not have granted this relief when Hayden did not request it. Alternatively, if such relief was permitted, then the trial court should have required Hayden to pay a portion of the expenses relating to use of Lot A, as it did for TOH's use of Lot C. TOH's Brief at 43.

Hayden argues that the trial court properly granted Hayden the use of Lot A at no charge because TOH did not seek to preclude Hayden's access to Lot A or charge Hayden for its use of this lot at any time during the litigation. Moreover, no documentation required Hayden to share in the expenses for Lot A, unlike the original 1950 deed required for the use of Lot C. Hayden's Brief at 58.

We first consider the trial court's grant of the right to use Lot A to Hayden. The trial court ordered, *inter alia*, that the parties were to be restored to the *status quo* before Hayden disrupted the parking lot and ingress/egres configuration that existed for many years. Judgement Order, 8/30/18, at 2. Specifically, the trial court directed that the parking areas on Lots A and C operate as a fully integrated, shared parking lot as they had done previously. Thus, the trial court authorized Hayden, its tenants, employees, customers, and guests to use the parking area on Lot A as well as the driveway that straddled Lots A and C to exit the shopping center onto Bethlehem Pike. ***Id.*** at 3.

The jurisprudence of this Commonwealth has long recognized important principles of equity. Nearly a century ago, our Supreme Court held that when one requests equity from the court, he must do equity. *Smith v. Yellow Cab Co.*, 135 A. 858, 860 (Pa. 1927) ("he who would have equity must do equity.") An equitable decree in one's favor must not harm those who are, or may be, affected thereby. *Id.* Consequently, when a party invokes the equitable powers of a court, equity may do justice for all of the litigants and vindicate their legal rights simultaneously. *See Ezy Parks v. Larson*, 454 A.2d 928, 936 (Pa. 1982). "[A] court of equity has the power to afford relief despite the existence of a legal remedy when, from the nature and complications of a given case, justice can best be reached by means of equity's flexible machinery." *Hill v. Nationwide Insurance Co.,* 570 A.2d 574, 576 (Pa. Super. 1990)(quoting *Peitzman v. Seidman*, 427 A.2d 196, 199 n. 4 (Pa. Super. 1981)).

In granting TOH the equitable relief it sought, the trial court was empowered to return both parties to the positions they previously occupied. At the time of the zoning proceedings, Bert Levy, Trustee was promised that, reciprocally, Lot A's parking and egress could be used for the benefit of C, in order to make the project happen. By doing so, Bert Levy, Trustee changed the use of Lot C's parking and driveway from one that was for the sole use of Lot C owners, tenants and occupiers, to one that was shared with Lots A and B for the benefit of the integrated commercial complex both property owners sought to develop. In doing so, Bert Levy, Trustee he relied upon the promise

made for the continued, future use of Lot A. Because the court used its equitable powers and granted a benefit to TOH, as owners of Lots A and B, (*i.e.*, the irrevocable license to use Lot C), under these particular circumstances, the trial court, similarly, granted a benefit to Hayden (*i.e.*, the right to use Lot A for parking and egress from the shared parking area). Based upon well-established principles of equity, we conclude that the trial court did not commit an error of law or abuse its discretion in granting Hayden the right to use Lot A.

Next, we consider the trial court's directive that Hayden share in certain expenses associated with Lot A. In its findings of fact and conclusions of law, dated 6/30/17, the trial court concluded that:

> 29. [TOH] and Hayden are each responsible for proportionate payment in the amount of one half for maintenance, expense and upkeep of the toll booth, passageways, driveways and parking area on Lot C.

> 30. [TOH] as owner of Lot A is solely responsible for all expenses on Lot A other [than] those that may relate to any part of the toll booth that stands over Lot A land.

Findings of Fact/Conclusions of Law, 6/30/17, at 21.

In its judgment order, dated August 29, 2018, the trial court reiterated its conclusion regarding Lot C. However, with respect to Lot A, it stated:

> 7. [TOH], as owner of Lot A is solely responsible for all expense on Lot A **other [than] those that may relate to** any part of the toll booth that stands over Lot A land, **and the shared parking area on Lot A land**.

***

9.  The Parking Area on Lots A, B, and C shall operate as a fully integrated, shared parking lot.

Judgment Order, 8/29/18, at 3 (emphasis added).

The trial court's directives in these documents are ambiguous regarding who should pay for expenses on Lot A.   In the trial court's findings of facts and conclusions of law, TOH is solely responsible for everything on Lot A, except the toll both, which the trial court required the parties to share in equally.  However, in its judgment order, the trial court directed that TOH is solely responsible for everything on Lot A, except the toll booth and the shared parking area on Lot A.  Although this ambiguity is unfortunate, we conclude the order best represents the trial court's intention.  Considering the trial court's entire disposition, it is clear that it intended for all parties to share in any cost associated with the shared parking lot.  As such, it ordered Hayden to contribute to the costs associated with the parking area on Lot A.  This is consistent with the trial court's directive that the parking areas on the different lots operate as an integrated parking area and consistent with the court's overall structure of its equitable relief.  Equity requires that Hayden share in the expenses for what it uses.  We therefore conclude that the trial court did not commit an error of law or abuse its discretion in ordering this relief.

However, because Hayden has a right to use Lot A for parking **and egress** from the shared lot to Bethlehem Pike, it is likewise equitable that Hayden pay for upkeep and maintenance of the driveway on Lot A. We discern no logical reason to exclude this shared portion of Lot A from Hayden's

obligation to share expenses associated with Lot A. We therefore conclude that the trial court erred in not including this expense, and modify the court's order to direct Hayden to share in this expense as well.

In sum, regarding the trial court's award of other equitable relief, we conclude that the trial court did not err in requiring the parties to hire a third-party manager. Additionally, the trial court did not err in granting Hayden the right to continue using Lot A for parking and egress as its predecessor had for 40 plus years. Furthermore, the trial court did not err in requiring Hayden to share in the expenses associated with upkeep and maintenance for the parking area on Lot A as stated in its judgment order. Likewise, Hayden must share in the future expenses for upkeep and maintenance of the driveway on Lot A.

We now address TOH's issues regarding the trial court's award of damages to Hayden for TOH's use of its property since 2014, the point at which the parties could not agree on expenses and TOH's respective contribution. When reviewing these issues, we are mindful of the following:

> The duty of assessing damages is for the fact-finder, whose decision should not be disturbed on appeal unless the record clearly shows that the amount awarded was the result of caprice, partiality, prejudice, corruption, or some other improper influence. In reviewing the award of damages, the appellate courts should give deference to the decisions of the trier of fact who is usually in a superior position to appraise and weigh the evidence. The damage calculation need not be determined with complete accuracy, but it must be founded on a reasonable factual basis, not conjecture.

***Boehm v. Riversource Life Ins. Co.***, 117 A.3d 308, 328 (Pa. Super. 2015) (citations and quotations omitted) (quoting ***Lesoon v. Metropolitan Life Ins. Co.,*** 898 A.2d 620, 628 (Pa. Super. 2006)).

First, TOH argues that the trial court's calculation of damages, through its accounting, improperly included costs associated with Hayden's commercial operation of the parking area on Lot C as expenses for "maintenance and upkeep." According to TOH, the phrase "maintenance and upkeep" does not contemplate expenses associated with the operation of a commercial parking lot. In particular, it argues the trial court should not have included expenditures for payroll, staffing costs, book keeping, and real-estate taxes in the amount TOH must pay. TOH's Brief at 45. TOH further claims that Hayden padded the expenses and shifted expenses from the business of Wendy Feldman (general partner of Hayden) to the expenses for the parking area. According to TOH, very little maintenance and upkeep was done to the parking lot. ***Id.*** at 45-46. It therefore asks this Court to remand this matter, so the trial court can recalculate expenses excluding these amounts and direct that they be excluded from future determinations of expenses. ***Id.*** at 46.

The trial court concluded that, because TOH had a right to use Lot C for ingress/egress and parking, TOH likewise had an obligation to pay 50% of expenses for "upkeep and maintenance" of those areas. The trial court directed Hayden and its parking-management company provide an accounting of the costs associated with those areas since January 2014.

Following a hearing, the trial court found that the nature of the expenses submitted by Hayden and the parking-management company were appropriate, including those to which TOH took exception as noted above. Additionally, the trial court found the amount of the expenses presented by Hayden to be reasonable and rejected TOH's exceptions to Hayden's accounting. Trial Court Opinion, 7/3/18, at 14-16.

The largest expense over approximately a 4-year period was for staffing. The trial court agreed that, as explained by Hayden, staffing was necessary to maintain the parking lot. Use of staff to keep and maintain the parking area on Lots A and C included manning the toll booth, cleaning the lot, assisting people with parking, excluding people who were not permitted to park there, and striping. Recognizing the importance of these activities, the trial court authorized the third-party manager in its discretion to consider the need for staffing of the lot. Payroll and bookkeeping are overhead costs associated with staffing and maintaining the parking lots. All of these expenses were documented.

Moreover, as Hayden argues, TOH presented no evidence to suggest that any of the expenses were associated with any operations other than the shared parking lot or that they were inflated. The trial court found that Ms. Feldman reasonably explained the changes in costs from years past.

Thus, based upon our review of the record, we do not find that the trial court assessed damages against TOH based upon an improper influence. We therefore will not disturb the trial court's determination that Hayden's

expenses were reasonable and that TOH should be responsible for its proportionate share.

Lastly, TOH argues that the trial court erred in imposing expenses on TOH for the period it was excluded from parking on Lot C. TOH was excluded from any use of Lot C for ingress/egress and parking from August 2014 until the trial court entered its Memorandum Opinion dated July 3, 2018. TOH's Brief at 46-47. TOH therefore asks the Court to reverse the trial court's order imposing expenses on TOH for this period. *Id.* at 47.

The trial court imposed a proportionate share of expense for "upkeep and maintenance" on TOH premised upon TOH's right to use Lot C for ingress/egress and parking. From November 2014 to July 2018, TOH was precluded from using Lot C in conjunction with its commercial complex. Although some patrons of the businesses on Lots A and Lot B may have parked on Lot C, this was beyond TOH's control. Rather, Hayden and its parking management company had the ability to control who parked on Lot C. Moreover, Hayden was not harmed by having patrons of Lots A and B parking there since it benefitted by collecting a fee.

Consequently, we conclude that the trial court erred in requiring TOH to share in the expenses associated with Lot C's ingress/egress and parking area during the time which TOH was precluded from using it. Therefore, we remand for the trial court to recalculate the amount TOH owes to Hayden, excluding expenses associated with this time period.

In sum, regarding the trial court's award of damages, we conclude that the trial court's assessment of damages against TOH to Hayden that included various expenses as discussed above, was not based on some improper influence, but rather was based on the evidence presented. As such, we affirm this portion of the award. However, the trial court erred in its assessment of damages against TOH to Hayden that required TOH to pay expenses for its use of Lot C during the time period Hayden barred it from using it. We therefore vacate that portion of the award and remand for the trial court to recalculate those damages. In all other aspects, the trial court's decision on damages is affirmed.

In conclusion, we disagree with the trial court that TOH acquired an express easement. However, based upon our review, we conclude that TOH acquired an irrevocable license. We therefore affirm the trial court's imposition of an injunction against Hayden to prohibit it from denying TOH's use of Lot C.

Additionally, we affirm the trial court's award of other equitable relief, including the parties' use a third-party administrator to manage the shared parking lot and Hayden's right to use Lot A for parking and egress to Bethlehem Pike as it previously did. Because the trial court afforded Hayden this right, Hayden was granted a reciprocal right to use Lot A, but must share equally in the expenses associated with the upkeep and maintenance of both the parking area and driveway on Lot A.

Finally, we affirm, in part, the trial court's award of damages to Hayden and against TOH. TOH shall pay its equal share of expenses for upkeep and maintenance of the parking area and entrance of Lot C since 2014 as determined by the trial court except for the time period that Hayden prohibited TOH from using the lot. On that limited issue, we vacate the trial court's award of damages to Hayden, and direct the trial court to recalculate this award.

Judgment affirmed in part and reversed in part. Case remanded for proceedings in accordance with this decision. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/28/2020